In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00054-CV
_____

ROBERTO RINCON, Appellant

V.

SOFIA BEREZKINA, Appellee

_____

On Appeal from the 410th District Court
Montgomery County, Texas
Trial Cause No. 20-02-02710-CV
_____

## MEMORANDUM OPINION

Appellant Roberto Rincon ("Roberto") filed a Petition for Divorce against Appellee Sofia Berezkina ("Sofia"), stating that he believed the parties would enter into an agreement regarding the conservatorship of their child, R.R., but in the absence of an agreement, he should be appointed sole managing conservator.[1] Sofia

_____

[1] To protect the minor's privacy, we refer to him by using his initials. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.9(a)(3).

1

filed a Counterpetition for Divorce seeking sole managing conservatorship of R.R. A jury found that grounds exist for a divorce, considered the question of conservatorship of R.R., and appointed Sofia as the sole managing conservator of R.R.

The trial court conducted a bench trial regarding the issues of visitation, possession, and access and signed a Revised Final Decree of Divorce incorporating both the jury's verdict and the trial court's Reformed Interlocutory Order, which ordered a Modified Standard Possession Order that deviated from the Standard Possession Order ("SPO") in the Family Code.

In three issues, Rincon complains the trial court abused its discretion by: (1) ordering him to surrender the child in Nice, France; (2) enjoining him from driving with R.R.; and (3) allowing testimony concerning R.R.'s paternal grandparents' non-violent, white-collar criminal history in violation of the parties' Agreed Order Regarding Certain Subjects at Trial ("Agreed Order"). For the reasons explained below, we affirm the trial court's Revised Final Decree of Divorce incorporating its Reformed Interlocutory Order.

**BACKGROUND**

The parties were married in Montgomery County in December 2018. In January 2019, the child, R.R., was born in Houston while his parents resided in Montgomery County. On February 12, 2020, Sofia filed for divorce and custody in

2

Moscow, Russia. On February 25, 2020, Roberto filed suit for divorce against Sofia, a nonresident of Texas who was served in Moscow. Roberto alleged that on commencement of his suit, he and Sofia were each a resident or domiciliary of Texas and that Sofia and R.R. had resided in Texas. In the event the parties failed to enter into a written agreement about R.R., Roberto asked the trial court to appoint him sole managing conservator and Sofia as the possessory conservator with supervised access. Roberto requested that the trial court consider Sofia's conduct of taking R.R. to Russia and refusing to return R.R., a United States citizen, as an act against Roberto's will in order to deny the trial court's jurisdiction. Roberto also asked the trial court to determine and issue a finding on whether R.R. had been subject to an international abduction and take necessary measures to protect R.R.

Roberto attached Petitioner's Unsworn Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") Declaration Under the Penalty of Perjury Regarding the Child the Subject of this Suit. Roberto stated that R.R.'s current address was unknown, but R.R. lived with him and Sofia in The Woodlands from January 2019 until January 2020. Roberto listed a Moscow address where he believed Sofia may be and stated that Sofia is also a citizen of Croatia and a lawful permanent resident of New Zealand, Monaco, and Austria. Roberto believed that Sofia had filed a proceeding in Moscow that could affect the current proceeding in Montgomery County but claimed he had not been properly served in any pending

3

Russian proceeding. Roberto attached a second Unsworn Declaration explaining that after their January 2020 winter vacation in France, Sofia abducted R.R., who was then twelve months old, and went to Russia. Roberto explained that Sofia refused to return R.R. to Montgomery County where he and Sofia had lived since their December 2018 marriage and where R.R. was born. Roberto stated that after R.R.'s birth he tried to get Sofia to seek help for her post-partum depression, and he was concerned R.R. was in physical danger.

In October 2020, the Moscow court signed a Russian Judgment granting Sofia a divorce and awarding Roberto very limited possession and supervised visitation. The Moscow Court denied Roberto's appeals of the Russian Judgment. In January 2021, Sofia filed a Plea to the Jurisdiction, Request to Decline Jurisdiction for Inconvenient Forum, Notice of Authority to Enforce Foreign Order, and Motion to Dismiss, and in March 2021, Sofia filed an Amended Plea. After conducting a hearing, the trial court denied Sofia's Amended Plea. The trial court found that the Russian Judgment signed on October 7, 2020, violated Roberto's constitutional rights and the public policy of Texas, and should not be recognized under the principles of comity. The trial court found that the parties stipulated that Texas was R.R.'s home state under the UCCJEA when both parties filed their respective suits for divorce in Texas and Russia. The trial court found that R.R. is a United States citizen and Sofia took R.R. to Russia against Roberto's will. The trial court

4

concluded that the Russian Judgment violates the public policy of Texas and Roberto's constitutional rights and declined to extend comity to the Russian judgment on those grounds.

In December 2021, Sofia filed an Original Answer. In February 2022, Sofia filed a First Amended Original Counterpetition for Divorce, asking the trial court to grant comity to the Russian Judgment and appoint her as the sole managing conservator of R.R. and Roberto as the possessory conservator with supervised visitation in Russia. Sofia alleged that Roberto had an extensive history of prescription drug abuse and requested that the trial court issue a permanent injunction enjoining Roberto from, among other things: (1) ingesting any opioid-related prescription drugs 24 hours prior to and during his periods of possession; (2) using illegal drugs within four hours prior to and during a period of possession or access to the child; and (3) using any drug for which Roberto does not have a prescription within four hours of possession or access.

Before the jury trial, the parties entered an Agreed Order, agreeing not to discuss or introduce evidence about the following subjects:

> 1. NEITHER PARTY SHALL REFER TO OR MENTION SANCTIONS BY EUROPE OR ANY OTHER COUNTRY OR ENTITY AGAINST EITHER PARTY'S FAMILY.
>
> 2. NEITHER PARTY SHALL REFER TO OR MENTION CRIMINAL HISTORY OF EITHER PARTY'S FAMILY.

5

3. NEITHER PARTY SHALL REFER TO OR CALL ANYONE IN EITHER PARTY'S FAMILY AN OLIGARCH.

4. NEITHER PARTY SHALL ASK ANY WITNESS WHY ROBERTO'S MOTHER WAS IN ANOTHER COUNTRY OUTSIDE OF THE UNITED STATES BUT THIS . . . DOES NOT PRECLUDE A PARTY FROM POINTING OUT THAT HIS MOTHER WAS OR WAS NOT PRESENT IN USA DURING THE YEAR THE CHILD LIVED IN THE UNITED STATES.

5. NEITHER PARTY SHALL REFER OR MENTION THAT EITHER PARTY'S FAMILY ACQUIRED THEIR MONEY ILLEGALLY, OR ASSOCIATES OR IS CLOSE TO POLITICAL PEOPLE IN VENEZUELA OR RUSSIA, INCLUDING VLADIMIR PUTIN.

6. NEITHER PARTY SHALL REFER TO OR MENTION THAT EITHER THE UNITED STATES OR RUSSIA IS GENERALLY MORE OR LESS DANGEROUS OR PRONE TO VIOLENCE.

7. NEITHER PARTY SHALL REFER TO OR MENTION THAT THEIR FAILURE TO TRAVEL TO THE UNITED STATES OR RUSSIA WAS DUE TO FEAR OF PHYSICAL HARM OTHER THAN COVID-RELATED PHYSICAL HARM.

The trial court also signed an Order in Respondent's Amended Motion in Limine, in which the parties agreed to refrain from mentioning or referring to certain matters in the jury's presence, including, among others, "[a]ny mention or reference to the family of the parties receiving any funds through illegal activities." The trial court signed an Order on Roberto's Motion in Limine, in which the trial court ordered the parties to refrain from mentioning or offering evidence of any allegation

6

that Roberto is a prescription medication or opioid addict or that he uses any prescription medication contrary to the prescribing doctor's orders.

The trial court conducted a jury trial on the issue of conservatorship, and the parties agreed that the trial court could use the evidence from the jury trial to determine the issues of possession and access during the bench portion of the trial.

Sofia's Testimony

Sofia testified that she is a Russian citizen and lives in Moscow, Russia. Sofia explained she is also a citizen of Cypress and Croatia, holds a residency in Monaco and Austria, a temporary visa in New Zealand, and has family-owned property in France. Sofia testified that in April 2015, she and Roberto, who is from Venezuela, started dating and met approximately nine times in different countries. In March 2017, Roberto proposed, and Sofia moved in with Roberto's parents in The Woodlands where she lived for approximately six months. In October 2017, Sofia and Roberto moved into their own home in The Woodlands, and in December 2018, Sofia and Roberto were officially married in The Woodlands. Sofia testified that R.R. was born in Houston in January 2019 and is a United States citizen.

Sofia testified that in 2014, she recalled Roberto going to the emergency room, but she did not learn he was suffering from rhabdomyolysis ("rhabdo") until a few months before trial. Sofia explained that she knew Roberto had several medical conditions, and although he told her he had cancer, she understood that his medical

7

records showed he did not. Sofia explained that from the time they met, she complained about Roberto's use of hydrocodone and demanded that he stop. Sofia believed hydrocodone caused Roberto to take three naps a day.

Sofia testified that, in January 2020, she, Roberto, and R.R. went to Courchevel, France to stay at her family's chalets, and before they left The Woodlands, she did not tell Roberto she planned to go to Moscow rather than return home. Sofia explained that while in France she learned that her green card was denied, and when she told Roberto via text message that she asked his father to send R.R.'s Russian passport, Roberto became upset and threatened to kill himself. Sofia testified that as a Russian citizen she needed a visa to enter the United States, and while her Russian passport had a visa at that time, the law required her to use her green card documentation. Sofia testified that she could not have used her passports from Croatia or Cypress to enter the United States because she did not have visas.

Sofia testified that R.R. was one year old when they left France on her father's private plane and flew to Moscow, where she worked part-time for a year before staying at home with R.R. Sofia testified that when she left, Roberto asked her to take their dog, and she told him she was flying to Moscow to think about things. Sofia did not tell Roberto she did not intend to return to Montgomery County. Sofia explained that in February 2020, she filed for divorce and for conservatorship of R.R. in Russia, and Roberto filed this case shortly afterward. Sofia testified that in

October 2020, the Russian Court granted her primary custody with no geographical restriction. Sofia stated that despite the Russian Judgment, the Montgomery County Court allowed Roberto's divorce suit to proceed.

Concerning her current living conditions, Sofia testified that she and R.R. live with her parents along with her younger brother and sister, whose boyfriend stays over. Sofia explained her parents' staff include a chef, housekeeper/babysitter, yard man, and one live-in maid. Since moving to Russia, Sofia entered the United States twice in 2022 through Dubai or Turkey using her Croatian passport, and she did not bring R.R. because both times she appeared for trial. Sofia explained that she uses a new electronic visa program that began in December 2021. Sofia testified that she offered to meet Roberto in France or Dubai for visitation with R.R., but Roberto refused.

On cross-examination, Sofia testified that she wants primary custody of R.R., who is three and a half years old, because she is his primary caregiver. Sofia testified that she does not have a nanny. Sofia explained that R.R. goes to an English kindergarten for half the day and before that he attended baby class. Due to Roberto's concerns of a speech delay, Sofia took R.R. to a speech therapist, who did not think R.R. was delayed. R.R. also attends gymnastics and swimming lessons, and Sofia sends Roberto pictures and videos of those classes. Sofia explained she has a lot of

family and friends in Russia, and R.R. attends play dates with his cousins and her friends' children.

Sofia testified that for the first year of R.R.'s life, Roberto's father was present, but his mother was only in the United States for one month. Sofia explained that while she and Roberto both have wealthy families, her family leads a modest lifestyle while Roberto's parents allow him to lead "the most luxurious lifestyle." Sofia testified that when she lived with Roberto, he worked at his father's office approximately two to five days a week for four to five hours. Sofia explained that they agreed she would mainly take care of R.R., and while Roberto liked to bathe R.R., she was frustrated Roberto was not more involved. Sofia testified that during the six months prior to her moving to Russia, Roberto would return from his father's office around lunchtime and "basically lay on the couch and in and out of sleep and watch TV series[]" until it was time to bathe R.R. Sofia explained they argued about Roberto's behavior and went to marriage counseling when R.R. was two months old because Roberto was unhappy with her and thought they were heading toward a divorce. Roberto stopped attending because he thought it wasted time and money.

Sofia testified that in 2015, Roberto told her he took a pill to make him feel happy and good, and she was concerned when she found out it was hydrocodone and demanded he stop taking it. Sofia stated Roberto said he would stop, but when she got pregnant in 2018, she realized he was still taking it because of his constant

10

constipation, serious nausea, rapidly changing temper, aggressiveness, "constant sleepiness during the day, and [lack of] a will to do anything at all[.]" Sofia explained that it "was like a roller coaster," and Roberto was getting prescriptions for pain pills from Dr. Kwoh and Dr. Armas, who gave him a prescription while he was "partying" in Miami. In 2020, Sofia invited Roberto to attend a rehabilitation program to save the marriage, but he refused. Sofia also testified that after reviewing Roberto's medical records, she was concerned about his long-term use of hydrocodone, suicidal thoughts, and use of medications without a prescription. Sofia testified that during their relationship, she took Xanax, Prozac, and nonprescription pain medicine, but she did not take antidepressants while she was pregnant.

Sofia testified that she rescheduled her green card interview so she could go to Courchevel to visit her family, and at that time, she had no plans to go to Russia or get a divorce. While she was in Courchevel, Sofia checked her green card status and learned her case was denied and that she was unable to return to the United States with any of her passports. Sofia testified that Roberto was aware of the situation and told her, " If you go and are turned back, you are never going into the U.S. again." Sofia explained that she and Roberto were fighting a lot and "in a very bad state of relationship at that point[,]" and when he left Courchevel he hugged her and told her he hoped she would be happy. Sofia testified that Roberto did not object to her and R.R. flying to Moscow with her family, which is what they did after

11

Roberto's father sent her R.R.'s passport. Sofia explained that she told Roberto that he had to acknowledge his problem and go to a rehabilitation program to save the marriage.

By attending trial, Sofia risked being turned away when she entered the United States using her Croatian passport with the Electronic System for Travel Authorization ("ESTA"), which is Visa Waiver Program. Sofia explained she was unable to permanently live in the United States, but Roberto could enter Russia with his Venezuelan passport. Sofia testified that Roberto offered to pay for a private jet to fly her and R.R. to the United States, but she did not know why Roberto would not come to Russia to see R.R.

Sofia described her relationship with her parents, who have been married for 35 years, as being loving and supportive, and she stated her life in Moscow is "nice." Sofia planned to enroll R.R. in the school she attended, which offers both a Russian and international degree that allows you to enroll in universities abroad and teaches Russian, English, and an optional third language. Sofia hoped Roberto would get healthy and maintain a good relationship with R.R., but she believed R.R. should remain in Russia with her because R.R. would be devastated if he were taken out of everything he has known. Sofia also believed that she acted in R.R.'s best interest by taking him to Russia because of the state Roberto was in at that time.

12

When asked if he she told Marcia Newman ("Marcia") that she would rather kill herself and the baby than let the Rincons raise the baby, Sofia answered, "Absolutely no." Sofia explained that she could think of a reason why Marcia would lie, and she did not know if the Rincons paid Marcia off but "[a]nything is possible." Sofia also testified that Roberto drove her and R.R. around in The Woodlands, and she did not recall ever telling him not to drive while taking hydrocodone because he had denied taking it since 2015.

Sofia testified that she complied with her doctor's recommendations regarding the use of Xanax while breastfeeding. Sofia explained that from her observations, the Rincons were not a close-knit family and had "fights and drama among them all the time." Sofia testified that she tried to mend the marriage while they were in Courchevel and asked Roberto to stay in France or go to Russia with her. According to Sofia, she and Roberto never settled on where they were going to "forever stay[]" and had discussed moving to New York, Spain, Portugal, and Monaco. Sofia explained that she sends Roberto photographs of R.R. and updates him regarding any injuries, and she tries to have R.R. communicate with Roberto twice a day through FaceTime or WhatsApp video but wishes Roberto had tried to see R.R. in person.

Sofia testified that Roberto could be a danger to R.R. when he is taking hydrocodone, and Sofia believed that Roberto was taking more than his doctors

13

prescribed. Sofia explained that although Roberto told her he stopped taking hydrocodone in 2015, in late 2017, she observed signs that he was still taking it, and in his deposition, he testified that he had been taking three pills of hydrocodone daily since 2014. Sofia testified that Roberto's medical records show he told his doctor he was taking less than that amount. Sofia agreed she told Roberto that his family is poison, and she needed to leave them to have a better life.

Marcia's Testimony

Marcia, a life coach, massage therapist, and reflexologist testified that she met Sofia through either Roberto or his mother. Marcia began seeing Sofia around 2017, and she saw Sofia for about five sessions, which included a combination of massage, reflexology, energy work, and some coaching. Marcia explained that during Sofia's last session in June 2019, she was surprised when Sofia came in upset and mentioned that "she would kill [R.R.] before she would let the Rincon family have him." Marcia testified that Sofia, who was irritated and unhappy, talked about her dissatisfaction with certain things, including Roberto's lack of ambition and his family members invading her privacy. Marcia believed Sofia's issues were hormonal and suggested that Sofia go visit her family for a while. Marcia explained that during an appointment with Roberto in February 2020, she told him what Sofia had said.

During cross-examination, Sofia's counsel approached the bench about the parties' Agreed Order and stated that he believed Roberto's counsel had opened the

14

door regarding the Rincon's family criminal issues by asking Marcia about Sofia's complaints. Sofia's counsel explained that Sofia's answer to Marcia's statement that Sofia wanted to kill herself and the baby will be incomplete, because "if she completes the reason why she wanted to get away from them, was because of the criminal behavior." Sofia's counsel stated that he had "no way of responding to that without going into it. Because that's what she was in there complaining about to her." Sofia's counsel also noted that Roberto's counsel elicited the answer from Sofia that "the family is poison," and that he needed to be able to explain why the family is poisonous. Sofia's counsel argued that they were using Sofia's statement "as a sword and stuck me, and now they're using it as a shield and saying, no, you can't say why she had this feeling about the family." Sofia's counsel explained that Sofia was fearful that people wanted to kill Roberto's father, who had private security.

Roberto's counsel argued that their questions did not go into any prohibited issues about the Rincon family's criminal history and that the situation was no different than Sofia's counsel questioning about whether Roberto went to Russia to see R.R. According to Roberto's counsel, they could not explain that Roberto did not go to Russia because he was afraid. The trial court agreed, explaining that not addressing these issues left the jury with a false impression. The trial court stated that Marcia's statement was "incredibly inflammatory[.]"

15

The parties explained that criminal charges for bribery against Roberto's father were brought before the parties' marriage, he pled guilty to three federal felonies, was out on bond and cooperating with the government, and has a pending sentencing date. Sofia's counsel stated Sofia wanted to get away because Roberto was concerned for his physical safety due to the risk imposed by Roberto's father "ratting" on people and cooperating with the government to lessen his sentence. Roberto's counsel responded that no evidence showed Sofia was worried about her life or R.R.'s.

The trial court explained that it's a problem when one side exploits the exclusion of evidence in the Agreed Order to create a false impression with the jury, which both sides had done, and the use of Marcia's statement could be partly explained by Sofia using the excluded criminal evidence. The trial court stated it was not fair to prevent Sofia from defending her statement. The trial court also believed that the parties would continue to "paint half the story . . . [s]o we might as well just bust it all open[,]" because "to leave these things unanswered is unfair to the other party." The trial court assumed that Roberto's counsel would have known that Marcia's statement could "open the door[,]" and determined that Marcia's statement could lead to an incorrect verdict and that the only way to cure the problem was to allow Sofia to explain her statement by discussing the Rincon family's criminal history. The trial court also found that Sofia's counsel had opened the door to why

16

Roberto did not travel to Europe to visit R.R., and that Roberto should be allowed to explain his decisions. Roberto's counsel stated that Roberto's explanation would include testimony that Sofia's father is an oligarch and a henchman of Vladimir Putin and that anyone who goes to Russia and opposes Sofia's father will end up in jail. The trial court explained that it did not want a "trial within a trial[]" or to mislead or confuse the jury but "both sides have opened doors that can't be closed anymore." The trial court stated it was harmful error to allow Marcia's testimony and not let Sofia respond.

Roberto's counsel asked the trial judge to strike Marcia's testimony and instruct the jury to disregard it rather than vacate portions of the parties' Agreed Order just as the trial court had instructed the jury to disregard the fact that there is a Russian Judgment. The trial court explained that Marcia's statement is different because it was not a general statement of fact that is benign and asked the parties to provide a limiting instruction or an agreement concerning "the scope of how far we get into all of these things." Sofia's counsel stated that he would like to ask Marcia if she knew why Sofia made the statement and that Sofia would testify that Roberto was scared for his own safety and the safety of his parents, who had armed security outside their home. Sofia's counsel indicated he intended to ask questions about Roberto's father's criminal history, his cooperation with the government, and the fact that his business partner was murdered and wealthy people had lost millions of

17

dollars in civil forfeitures and gone to prison because of him. Sofia's counsel stated he would limit those questions, which relate to the child's best interest, to Sofia, Roberto, and Roberto's father.

Roberto's counsel indicated she would ask for a mistrial and argued that she did not violate the Agreed Order, the testimony is irrelevant, and she proposed an appropriate remedy to strike Marcia's testimony and instruct the jury to disregard it. Sofia's counsel argued that an instruction to disregard could not cure Marcia's prejudicial testimony. The trial court indicated it was mindful of relevance and confusing or misleading the jury and stated both parties could present limited testimony to clear up any false impressions with the jury.

### Dr. Andreea Andrei's Testimony

Dr. Andreea Andrei ("Andrei"), Roberto's psychiatrist, testified that she began seeing Roberto in October 2021 because he was missing R.R., who had been in Russia since January 2019, having trouble sleeping, and feeling anxious and depressed. Andrei explained that Roberto was in significant distress and having passive thoughts of suicide but was not suicidal. Andrei diagnosed Roberto with adjustment disorder with mixed, anxious, and depressed mood. Andrei explained Roberto was experiencing symptoms in response to the stressor of being separated and not having access to R.R. for such a long period. Andrei testified that Roberto's emotional struggles included feeling overwhelmed, alone, tired, and exhausted.

18

Andrei noted that Roberto stated that his current state was different than his usual baseline, which included being very high functioning with the ability to handle many things without feeling overwhelmed.

Andrei testified that Roberto reported having rhabdo and an abdominal liposarcoma surgery. Andrei testified that Roberto reported he had been taking up to three hydrocodone pills a day for muscle pain for about six years, and she was concerned about potential physical side effects from long-term treatment with opiates. Roberto also reported taking nausea and sleeping medications. Andrei testified that the Texas Prescription Monitoring Program ("PMP") confirmed Roberto's medications "had been consistent throughout the years, same dose, same frequency prescribed by the same doctor." Andrei explained that she initially prescribed Roberto Mirtazapine, which lessened his anxiety and improved his mood and ability to sleep and function, and later she prescribed Trazodone to help him sleep and switched the Mirtazapine to Lexapro because of weight gain. Andrei testified that Roberto was taking Lexapro and had stopped taking Trazodone. Andrei noted that Roberto had previously taken Xanax while in France to help him sleep. Andrei also testified that things were stressful, and Roberto reported that he was "'constantly working[] in fighting mode[,]'" his entire family got deposed, and he was worried about the war in Russia.

On cross-examination, Sofia's counsel indicated he wanted to go into the fact that Roberto's anxiety and stress was because of his parents' situation and his family being deposed. Sofia's counsel stated that he should be able "to test [Andrei's] knowledge and what is she basing her opinion on and the lack of information given to her." At that point, the trial court stated the following:

> . . . I am finding that the parties have reached agreements prior to trial and proposed agreed order regarding certain subjects at trial. Those agreements were drafted by the attorneys, signed by this Court. After the attorneys signed same, I am finding that both sides have opened the door on numerous issues in this particular order by asking questions, although they're not violative of the order itself, leaving unfair impressions in the minds of the jury on various issues in this order and that, in order to cure those problems, that the Court is going to allow certain evidence in that, essentially, to some context, dissolves the severity of this order that was agreed to.
>
> . . .
>
> And so, therefore, I am finding that the ones that are affected are 1, 2, 3, 4, and 7, potentially 5, although I don't know that 5 is necessarily going to be triggered. That's one of those things that we will evaluate.
>
> As to the witness at hand, the issue with Dr. Andrei is that the - - she was asked what was causing - - or what she was told by the patient was causing her - - causing him to feel anxious, lose sleep, depression, all of those things. It is only proper that they be able to ask if there was anything else she - - that Mr. Rincon told her that might be causing those same symptoms.
>
> So, in other words, I am going to allow that to be questioned, . . . [.]
>
> . . .
>
> … I want it to be limited - - initially, at least until you approach - - to something to the effect of, did he tell you any other reasons why he may not be able to sleep, why he was anxious, why he was depressed.
>
> . . .
>
> So then the - - now, what I do not want you to do is, I do not want you to lead. I know you can because its cross, but I do not want you to

20

on this topic because of what has already - - y'all agreed to previously and the spirit of what y'all all agreed to previously and the fact that we have not gone through the extent that certain evidence is going to come in.

So right now, what I will allow you to do is another broad question: Did he tell you any - - about any legal proceedings or criminal proceedings that may affect his family members? Something like that where it's - - you know, you're not giving her the answer. Because we don't know if she knows yet. If she does, she will sit there, and she'll say it. If she doesn't, then it's going to come out. We're going to tailor that information later when we pass this witness and we have another break and we can have the opportunity to clean this.

. . .

. . . if we're opening the door, as I told you on the deal about why he didn't go visit and all that, that's also relevant to this - - this particular witness. Did he tell you anything else? Did he - - did he say anything else about why he didn't - - now, I also don't want you to inject the answer to her.

. . .

I do not want you to say, did he say that he was afraid of her father or what might - - you know, open questions. . . .

. . .

Because we are - - this is something y'all created. This is the problem. Y'all did this. I think that - - quite frankly, I don't think that most of this stuff is - - y'all chose to exclude it. So we can either toss it, and it's - - I mean, honestly, when you start going through the analysis, both sides - - all of this is fair game.

When you go through and you look at - - is it relevant? Is it material? Is there unfair prejudice, I mean, or the danger of unfair - -

There's a difference between prejudice and unfair prejudice, and I don't know that all of these things don't - - I think they all come in based on the case law.

. . .

So there we are. I am limiting you on this witness to what you absolutely need with regard to cleaning up why he - - at this point, the impression that he has only anxiety and depression and sleeplessness because of this one issue. And there could be other issues, and I think that that is fair game, and what he told her is fair game.

. . .

21

. . . At this point, I am dissolving items 1through 4 and No. 7 on the agreed order regarding certain subjects at trial.

. . .We're not going to spend any more time where both of y'all are using it as a sword and a shield[.] . . . I am finding that it is relevant and admissible and is not unfairly prejudicial to either party. Proceed.

As for Roberto's thoughts of suicide, Andrei testified that Roberto stated that when he moved from Venezuela to the United States when he was sixteen, he had a "'never-ending frustration'" with his father, who was never a father to him, and that "'I wish someday I would kill myself just so he can see the impact he had[.]'" Andrei testified that Roberto knew he would never do it because of the impact on other people and his dog. Andrei testified that Roberto has had trouble sleeping for over five years, which was only partially because of R.R., and he reported taking two naps during the day. Andrei stated that Roberto doubled the dose of Lexapro she prescribed on his own, and she agreed that long-term opiate use can cause addiction, and that hydrocodone can cause impairment. Andrei testified that she either did not recall Roberto telling her about his parents' criminal history or he did not tell her.

Marcia's Cross-Examination

Marcia testified that Sofia was upset and had "faulty thinking[]" when she said she would kill her child. Marcia testified that Sofia had told her about Roberto being scared for his personal safety because of his father's criminal history. Marcia testified that she told Sofia that Roberto's father had "some heavy, dark energy around him[]" and that she "didn't want to go back out there."

22

Dr. Eugene Choi ("Choi"), a surgical oncologist and general surgeon, testified that he initially saw Roberto five years ago for an abdominal mass. Choi explained that the referring diagnosis was liposarcoma, which is a fat content tumor that has features of being an invasive cancer, and that the mass was "unusual, atypical, and very concerning for a liposarcoma." After performing surgery and removing the mass, Choi testified that the pathologist determined that Roberto had a lipomatous neoplasm with atypical features that came back negative. Choi testified that in simplistic terms Roberto had a "fatty growth[]" that "could potentially even be precancerous." Choi prescribed Roberto opioids for one month upon his discharge from the hospital for pain and that there should not have been a need for more pain medication. Choi explained that Roberto's follow up images are negative for any kind of reoccurrence. On cross-examination, Choi agreed that Roberto's mass was noncancerous.

Dr. Christopher Kwoh's Testimony

Dr. Christopher Kwoh ("Kwoh"), Roberto's nephrologist, testified that he started treating Roberto in 2013 when he came to the hospital with a recurrent rhabdo episode. Kwoh explained that the most devastating complication of rhabdo is kidney failure, and Roberto presented with severe muscle pain, darkened urine, and "very, very high[]" level of creatine phosphokinase ("CPK"), an enzyme in the muscles

that leaked into his blood. Kwoh testified that Roberto had previously visited a neurologist and had a muscle biopsy and special muscle studies. Kwoh explained that it is unusual for someone to have more than one rhabdo episode in their life, but Roberto had a "persistent, abnormal CPK[]" and was "behaving like he has a myophosphorylase deficiency or abnormality, commonly called McArdle's." Kwoh explained that rhabdo is a chronic metabolic muscle disorder that causes muscle pain and injury and that acute rhabdo episodes can cause nausea.

Kwoh encouraged Roberto to exercise as much as he could tolerate for muscle protection, which requires pain management, but Roberto must avoid medications that increase kidney damage, which occurs during rhabdo episodes. Kwoh had prescribed Roberto hydrocodone for years as part of the long-term management of his muscle disease so he can maintain his physical fitness, which reduces the risk of a severe episode. Kwoh explained that he was not concerned about Roberto becoming addicted to opioids because he had been "on the same prescription unchanged for a few years, and I haven't had that pressure from him to change the dose." Kwoh prescribed Roberto three pills a day to push through the pain and exercise to reduce the risk of severe rhabdo, and he explained that a recent test showed that Roberto had "right around 16 milligrams daily, MME, which is a really low dose." Kwoh testified that based on Roberto's prescription refill requests, he did not use more than two doses per day on average after exercise, but Kwoh explained

that Roberto was getting his prescription on a regular basis once a month and "would be averaging at probably closer to three pills a day." Kwoh had no reason to suspect that Roberto has an addiction or an opioid problem, and he explained that all Roberto's opioid prescriptions came from him except for when Choi prescribed a "relatively short-term prescription[]" following Roberto's surgery.

On cross-examination, Kwoh testified that Roberto has been stable, but his condition is likely to progress over time because his exercise tolerance could get worse which would result in less activity and more pain. Kwoh testified the side effects of hydrocodone included drowsiness and blurred vision. Kwoh testified that he prescribed Roberto Paroxetine for anxiety and was unaware that Roberto had obtained Xanax out of the country. Kwoh agreed that his records show that in December 2015, he discouraged the use of benzodiazepine. Kwoh planned for Roberto to maintain his current regimen of hydrocodone for the foreseeable future.

Kwoh explained that if Roberto is taking three pills a day, his morphine milligram equivalent per day is 22.5, and a threshold of 40 to 50 milligrams of morphine a day has been a common trigger to indicate someone needs a pain management specialist. Kwoh testified that 2.2 pills a day is equivalent to 16.5 milligrams of morphine per day, which is Roberto's reported opioid use. Kwoh testified that there is always a risk a person can lose the normal use of their mental and physical abilities and become intoxicated by taking opiates, and that a person

25

should not be operating heavy machinery when taking significant doses that affect their reflexes. Kwoh also agreed that, depending on the dose, a person could become impaired and should not operate a motor vehicle. Kwoh testified that taking opioids could cause a person to be sleepy and need naps.

On redirect, Kwoh testified that since 2013, Roberto had not reported being in any car accidents. Kwoh explained that in January 2016, he noted that Roberto reported having sleep issues and recalled Roberto telling him "something about his father being arrested." Kwoh testified if Roberto stopped taking opiates, he would be concerned that Roberto would stop exercising, lose his fitness, and become more prone to having recurring rhabdo episodes and hospitalizations.

<u>Ricardo Rincon's Testimony</u>

Ricardo Rincon ("Ricardo"), Roberto's twin brother, testified that he lives in Carlton Woods near Roberto and their father and sister. Ricardo testified he is married and has a daughter who is a one and a half years old. Ricardo explained that he had a good relationship with Sofia, but Sofia's attitude changed when she became pregnant because she thought she was too young to be a mother. Ricardo explained that he realized Sofia was not a good person when his brother stepped in to care for R.R. because Sofia was tired, depressed, or overloaded. Ricardo testified that Sofia told him that she was worried that Roberto misused his medication and was a drug addict. Ricardo testified that he never saw Roberto inebriated or unable to drive a

26

car. Ricardo observed Sofia and R.R. riding in the car with Roberto "[a]ll the time." Ricardo explained that Homeland Security arrested his father in 2016 for financial charges, and in 2018 or 2019 his mother was detained in Spain for crimes and could not leave the country.

On cross-examination, Ricardo testified that he is close to his father and was concerned about his arrest. Ricardo was aware that his father's charges were related to bribes concerning PDVSA, an oil company owned by the state in Venezuela. Ricardo testified that the family company he and Roberto work for conducts only one business, which is suing PDVSA. Ricardo testified that he was arrested once and that his brother was also charged in Spain. Ricardo denied that the police raided his father's home.

Ricardo stated he was very close to Roberto, but he testified at his deposition that he was unaware of whether Roberto took hydrocodone, and that Roberto had not complained to him about being in pain in the last two years. Ricardo testified that after Sofia told him about Roberto being a drug addict, he did not ask Roberto if he was taking hydrocodone, but he knew his brother to be someone who takes painkillers because he has a condition. Ricardo testified that the one time he called R.R. in Russia, Sofia allowed R.R. to talk to him. Ricardo testified that Sofia had zero good qualities as a mother.

27

On redirect, Ricardo testified that Roberto is a dedicated father. Ricardo testified that Sofia's father was "very powerful in Russia[]," and a close friend of Putin. Roberto testified that Sofia lives a very luxurious lifestyle in Russia.

<u>Alexandra Cautilli's Testimony</u>

Alexandra Cautilli ("Alexandra"), Roberto's sister, testified that she spent time with R.R. during his first year. Alexandra explained that her first encounter with Sofia in 2016 was shocking because she "had mood swings every five seconds[,]" insulted Roberto, and appeared "[n]ot only drunk but drugged." Alexandra testified that the second time they met in Spain, Sofia was a "whole different person[.]" Alexandra explained that when Sofia moved to The Woodlands, she stayed at Alexandra's parents' home for a couple of months.

Alexandra testified that Sofia confided in her and told her Roberto had anger issues, was verbally violent, and liked to take pills. Alexandra explained that Roberto and Sofia had a housekeeper and a nanny, who did most of the job of holding and feeding R.R. Alexandra stated that Roberto helped care for R.R. at night and bathed him, and Sofia told her he was an "excellent dad." Alexandra said that Sofia also told her she didn't like living in America, wanted to go back to Moscow with R.R., did not intend to return, and was heartbroken to keep R.R. away from Roberto who she knew was "such a great dad." Alexandra testified that Sofia's relationship with her parents is cold and distant.

28

During cross-examination, Sofia's counsel asked Alexandra if her parents had set up trusts to fund her and her husband's lifestyle, and when the trial court asked how it was probative to the case, counsel reported that he believed "this family's lifestyle . . . is funded by ill-gotten criminal behavior." Roberto's counsel objected that Sofia's counsel had violated number 5 of the Agreed Order and asked for sanctions, and after the trial court noted that number 5 had been violated and was not dissolved, Sofia's counsel stated he "did not mean to[.]" The trial court stated the "conduct in this case is nothing I've ever seen[,]" and described the conduct as "obscene." The trial court instructed the jury to disregard the last question and not make any inferences or speculations. The trial court stated that "as far as the opening-the-door situation as to the Rincon criminal stuff that might have made her feel the way she did to make a statement, y'all are going way beyond that[,]" and you need to "use it the way that the Court has told y'all you can use it and the way that it opened the door."

Alexandra then testified that she knew Roberto was in a lot of emotional pain because of R.R. being taken away, but she did not know of his recent physical pain. Alexandra testified that Roberto did not currently take painkillers. Alexandra explained that her parents previously had security guards, whom she believed had guns, outside the gate of their home in Carlton Woods. Alexandra testified that the purpose of the security guards was to protect the family, which included coming

29

inside the clubhouse when they ate lunch. Alexandra did not know if her family's membership to Carlton Woods was suspended in 2016. Alexandra explained that it was normal to have bodyguards in Venezuela and Moscow.

Alexandra described Sofia as a loving, funny, and sweet mother. Concerning when Sofia told her that she was taking R.R. to Russia and did not intend to return to America, Alexandra testified that the conversation took place after Sofia, Roberto, and R.R. went to Courchevel. According to Alexandra, Sofia returned alone from Courchevel for one day due to a technicality regarding her permit and then flew back. Alexandra told Roberto that Sofia was not happy and let him know that the conversation happened.

Sara Marillo's Testimony

Sara Marillo ("Sara") testified that she has worked for Roberto in Carlton Woods since July 2017, and Sofia lived there at that time. Sara testified that after R.R. was born, three Russian-speaking nannies worked there to help Sofia, and two of them lived in the house. Sara explained that she oversaw taking care of the house, cleaning, and cooking, and her interactions with Sofia were "very good." Sara testified that the nanny was always with Sofia. Sara described Roberto as very loving and a good dad who took care of R.R., and she stated the nanny took care of R.R. when Roberto went to the office five days per week. Sara stated that Roberto and Sofia "treated each other very well with lots of love." Sara never observed Roberto

30

being under the influence of drugs or alcohol, and Sofia never complained about Roberto and was always on her computer. Sara never saw Roberto napping. Sara explained that Roberto was learning Russian, Sofia spoke Spanish to her, and R.R. spoke very little Spanish. Sara never observed Sofia not allowing R.R. to ride in the car with Roberto.

Roberto's Testimony

Roberto testified that he lives in The Woodlands. Roberto met Sofia in Europe in 2013 after being hospitalized for his first rhabdo episode. Roberto explained that he and Sofia "hit it off[]" and traveled together all the time, and he flew to Moscow to meet her family. Roberto testified that he traveled with Sofia to Moscow "[a]pproximately 10, 15, 20, all together." Roberto explained that Sofia's father was a successful Russian oligarch, and in the beginning, her family was "cold[]'" towards him. Roberto testified that Sofia told him her father and Putin "knew each other."

Roberto testified that when they were in Courchevel, he and Sofia discussed "sending the passport to take [R.R.] back to Moscow because her status had been canceled and she couldn't come back." Roberto explained the conversation took place before Sofia contacted his father and that they "didn't' agree[]" and he was against it. Roberto also explained that Sofia did not leave Courchevel and travel to Houston to get R.R.'s passport and that Alexandra's "timeline is mixed[,]" because that situation occurred the prior summer. Roberto testified that the first time Sofia

31

told him she was not returning to the United States was when they were in Courchevel. Roberto testified he was "upset and angry toward Sofia because we had a conversation if this could ever happen[,]" and she was "disregarding my opinion[.]" Roberto agreed to let his father send Sofia R.R.'s passport because "her travel document had been canceled due to the schedule of that green card interview[,]" and she needed to go to Russia for a couple of months to spend time with her family and R.R. until her green card interview was rescheduled. Roberto explained that after Sofia went to Russia, she called and told him she filed for divorce in Russia and was not coming back, so he filed for divorce as well.

Roberto explained that before going to Courchevel, Sofia had not expressed any concerns about his family. Roberto testified that Sofia got along well with his family but sometimes she complained they were "a little bit too intrusive, like too involved[.]" Roberto testified that "too involved" meant his father would show up unannounced to visit, his sister was always giving parenting advice, and he spent too much time with his twin, Ricardo. Roberto explained that he did not know what Sofia meant when she said "your family is poison" because she never complained before.

Concerning his father's criminal charges, Roberto testified that Sofia told him to calm down and not worry because "[t]hese sort of things happen quite often, and it's just not that big of a deal." Roberto testified that Sofia told him to talk to his

father so "we could transfer all our assets to Russia where it would be protected[,]" but he told her "no, we don't have anything to hide." According, to Roberto, his personal assets were not frozen. Roberto explained that Sofia never told him she feared being harmed because of his father's situation or that she was concerned about R.R.'s safety. Roberto testified that in 2017, his father went to jail for eight months and is a United States government witness. Ricardo stated that no other member of his family was charged, and that Sofia knew his father was in jail when they were dating. Roberto testified that he had trouble sleeping during that time.

Roberto also explained that he did not go to Moscow to visit R.R. because Sofia told him her father was "really powerful and well connected to the government." Roberto explained that the State Department had warned Americans not to travel to Moscow due to the increased risk of arrest and incarceration for no reason, and that he did not feel safe going to Moscow because Sofia's father has a "really strong connection" to the government and Putin. Roberto explained that he did not go to Dubai because he knew there were a lot of Russian oligarchs living there, Sofia's father had business interests and connections there, and he "really didn't feel safe." Roberto also explained he wants to see R.R. but is "always conflicted" about traveling to Russia or Dubai because of Russia invading Ukraine and the "constant instability and volatility of the situation[.]"

Roberto did not deny that he approved of his father sending R.R.'s passport to Sofia. Roberto was shocked when he first learned of Sofia's allegations of verbal abuse in the divorce documents. Roberto explained that the allegations were untrue, and he apologized if he ever made her feel that way. Roberto claimed that Sofia did not mention all the reasons and allegations about why she moved R.R. to Russia until after she filed for divorce. Roberto testified that Sofia had called him names and slapped him in the face.

Roberto testified that during their marriage, he and Sofia attended church every Sunday with his family and had a family lunch. Roberto stated that Sofia was "really close" to his family. If granted custody of R.R., Roberto planned to enroll him in pre-k and then the John Cooper School and have him tutored in Spanish, English, and Russian. Roberto also planned to involve R.R. in activities, including sports and camps. When asked if he wanted sole managing conservatorship of R.R., Roberto testified that because Sofia abducted R.R., he wanted to do anything he could to prevent that from happening again. Roberto described Sofia as a loving and caring person who had supported him through his hardest times, including his surgery and family situation, but explained they had different parenting skills, and she could be stubborn. Roberto also explained that during their marriage he went to work every day and never napped before he and Sofia were together.

On cross-examination, Roberto testified that he started napping after Sofia went to Russia. When shown text messages he sent to Sofia about taking a nap, Roberto claimed that he did not say he didn't start taking naps until she moved to Russia and that his answer lacked context. Roberto agreed that his tumor was benign and that he was not taking pain medication for his 2016 surgery. Roberto testified that rhabdo causes him severe pain, and he has been taking three hydrocodone pills every day since 2014. Roberto agreed that his medical records show that at times, he told Dr. Kwoh he was only taking one dose per day. Roberto also agreed that Dr. Kwoh's records show that in 2018, he reported that no one else was prescribing him painkillers, but Roberto admitted that Dr. Armas prescribed him painkillers twice in 2018. Roberto also admitted that he did not tell Dr. Kwoh he got 60 pills prescribed for one weekend when he partied or that his dentist had prescribed him painkillers. Roberto intended to continue taking three doses of hydrocodone every day. Roberto admitted to getting Xanax in France without a prescription and that when he asked Dr. Kwoh to prescribe Xanax, he prescribed another medication.

Roberto explained that he also takes Zofran for his day nausea and sleeping pills, which he was taking before Sofia left. Roberto testified that in 2016, he had anxiety about his father going to jail, and his anxiety had increased since Sofia left. Roberto testified that in 2014, he told Sofia there had been an attempt on his father's life, and he knew his father was cooperating with the United States government

35

against other defendants, but claimed he first heard that Sofia was afraid after she moved to Russia. Roberto denied that he and his family were at risk for harm, but he agreed that he testified in his deposition that he feared the Venezuelan government would harm his father. Roberto testified they moved to the United States because of the attempt on his father's life in Venezuela.

Roberto testified that Sofia complained about his use of hydrocodone one time in 2015, five years before she moved to Russia. Roberto explained that after Sofia moved to Russia, she demanded that he go to rehabilitation to save the marriage, but he claimed that the issue of him using painkillers was not a longstanding issue between them. Roberto testified that he assumed that Sofia brought up his use of hydrocodone when they went to marriage counseling, which was a year before she went to Russia. Roberto admitted having suicidal ideation and that he probably told Dr. Andrei that he gets really angry and fears being in a rage and "never got a gun, to not act on my impulse." Roberto testified that having rhabdo and using hydrocodone and other medications would not impact his ability to take care of R.R. Roberto testified he was a daily smoker, but he never wants R.R. to see him smoking.

Roberto explained that he did not accept Sofia's offer to visit R.R. in Europe because of a "mixture of different things[,]" but admitted he took two trips to Columbia. Roberto also explained that he acquired his home in 2017, after his father was charged, with funds his father gave him. Roberto admitted that he "walked

36

out[]" on marriage counseling and never returned. Roberto testified that he speaks limited Russian and R.R. speaks predominately Russian, but he stopped taking Russian lessons after R.R. went to Russia two years ago.

On redirect, Roberto testified that he did not choose for R.R. to live in Russia and does not think it is fair that he should learn Russian to speak to R.R., but he "made an effort" because R.R. does not speak any other language. Roberto explained that he and Sofia agreed that R.R. would learn English and only speak Russian with Sofia and Spanish with him. Roberto believed that R.R. should return to The Woodlands, where he would have a better quality of life, because it is where he was born and with family he knows. Roberto testified that Sofia had been in Dubai and told him she was "really broken[]" since the war started and did not know what her future would be because she "didn't have access to her money." Roberto was concerned about the war and the unpredictability and future danger to both Sofia and R.R. Roberto had no plans to exclude Sofia from R.R.'s life.

Roberto testified that when he bought Xanax that summer in France to sleep, both he and Sofia used it. Roberto explained that the only reason he got a prescription for oxycodone from Dr. Armas in Miami twice because he was in pain and forgot Dr. Kwoh's prescription. Roberto explained that his dentist prescribed him hydrocodone after performing a surgery. Roberto testified that Sofia never complained about R.R. riding with him in the car. Roberto explained that he did not

37

travel to Europe to see R.R. because of travel restrictions, COVID, and because it was the same as Russia since Sofia's family owned several of the properties. Roberto also agreed he had not paid any child support for R.R. in the last two years.

Grigory Berezkin's Testimony

Grigory Berezkin ("Grigory"), Sofia's father, testified that he has a Ph.D. in organic chemistry, works for Moscow State University, and is an investor in three main areas: electricity and utilities, media, and IT. Grigory lives in a home on twenty acres near central Moscow in the "green area." Grigory stated the home has a "good garden[,"] warm swimming pool year-round, gym, and playing area for R.R. Grigory described his grandson, R.R., as a "warm boy[]" with "a very good atmosphere around him[]" and who almost never cries. Grigory described R.R.'s life as loving, stable, and organized, and he explained that R.R. watches English cartoons. Grigory explained that it is common for multiple generations to live in the same household in Russia, and he currently lives with his wife, Sofia, R.R., youngest daughter and her boyfriend, son, six dogs, and two maids. Grigory testified his son was born very premature and required lots of care in England to survive, so he started charity projects to help Russia address neonatal problems and built a hospital for leukemia and cancer.

Grigory explained that his father was a priest and that sets "a very high standard of moral and relationship and everything in the family[.]" Grigory testified

38

that his family likes to travel to recharge, improve family relations, make memories, and understand the world. Grigory testified he takes R.R. to his hangar where he collects and restores old cars. Grigory explained his collection totals 200 cars, including prewar cars, and he is creating an automobile museum in Moscow. Grigory plans for R.R. to attend the Moscow School of Economics, learn multiple languages, and obtain an international degree.

Grigory testified that he has never met Putin in person, but because he owns media and businesses in Russia, he attends big conferences where Putin is present along with other world leaders. Grigory denied being an oligarch, who he described as a person who collaborates with the government and uses government power to make his business, and claimed he never worked with the government. Grigory explained he was a member of RAND Corporation, a public organization for international development, for twenty years and a friend of Jon Hunstman, the ex-governor of Utah and former ambassador to Russia. Grigory also testified that he was sanctioned by the European Union for six months and prohibited from going to Europe, where his bank account is frozen, but he is appealing his sanctions because he believes they are incorrectly based on owning a company he sold eleven years ago. Grigory explained he was financially "okay" because his assets and bank accounts are in Russia.

Grigory described Sofia as a loving and responsible mother who is educating R.R. Grigory explained that Sofia gets R.R. up in the morning, has breakfast with him, and provides a structured day, which includes an English-speaking kindergarten. Grigory's goal is for R.R. to be successful, happy, and have a big heart, including loving Roberto, who Grigory generally likes. Grigory met Roberto on five to seven occasions in the United States and many times in Moscow and western Europe, and he explained the last time he saw Roberto in Courchevel, he was "very detached[]" and stayed in the house and in his room most of the time on his computer, sleeping, napping, and watching movies. Grigory explained that while in Courchevel, Roberto changed his plans and told him he needed to urgently return to Houston, and Sofia was upset when Grigory told her Roberto had left. Grigory testified that Sofia is R.R.'s primary caretaker during their trips.

Grigory testified that if Roberto had asked, he would have helped him see R.R. because it is important for R.R. to know his father in person. Grigory claimed that going to Moscow was "no problem[,]" and he was willing to help Roberto see R.R. Grigory explained that Sofia allows Roberto to FaceTime with R.R. every day. Grigory testified that R.R. is very attached to Sofia and becomes upset when she leaves, and it would be a tragedy if R.R. was not allowed to live in Russia. Grigory did not believe Roberto could be R.R.'s primary caregiver if he is detached.

On cross-examination, Grigory testified he did not tell Sofia he would help Roberto move his assets to Russia. Grigory explained that he paid for the airplane that Sofia and R.R. flew on from Courchevel to Moscow. Grigory testified he was a citizen of Russia, Croatia, and Cypress. Grigory obtained his Croatian citizenship in 2006 because he did a lot of charity there, and it allowed him to travel freely unlike his Russian passport. Grigory became a citizen of Cypress because Cypress "facilitated things to happen[,]" and "was very interested in any sort of investments in the country." Grigory is a permanent resident in Monaco and Austria due to having long-term rentals. Grigory is also a resident of New Zealand and owns property in France. Grigory agreed that he financially supports part of his family, including R.R. Grigory testified that he had no plans to move from Russia but has a right to, and Sofia asked Roberto to sign documents allowing R.R. to become a Monaco resident. Grigory believed there was "no difficulty at all to come see the child anywhere." Grigory agreed that he had also been sanctioned by Canada and the UK, which froze his company account, along with Finland, which froze his assets.

On redirect, Grigory testified that he attached letters to his appeal of his sanctions that were written by twenty politicians, world leaders, Russian media leaders, the top world economist, and a Nobel Prize winner. Grigory explained that he and Sofia entered the United States to attend trial by applying for the ESTA program, which allows a maximum stay of 90 days. Grigory testified that he knew

41

Roberto's father had given him expensive cars, but he felt that giving children those types of assets is inappropriate because it "destroys the life of the kids." Grigory believed that gifts spoil people and you needed to work hard and live a "normal, simple life." Grigory explained that his property in France is family owned.

<u>Arina Berezkina's Testimony</u>

Arina Berezkina ("Arina"), Sofia's sister, testified that she likes living with her family very much, and she enjoyed growing up in the "green area in the park" and being outdoors in nature but still close to the city. Arina explained their neighbors are mostly business-oriented people with families. Arina testified that the river and lake are nearby, and they like to swim, wake surf, and water ski in the summer and cross-country ski in winter. Arina explained that her sister is married to a world champion in freestyle kitesurfing who is now an entrepreneur who has a family restaurant with an outside area that is an ice park in the winter and a wakeboarding lake in the summer.

Arina explained that R.R. is "very attached" to Sofia and has a "special bond[]" with his grandmother, who is very active with sports. Arina testified that there is thirteen years difference between R.R. and her younger brother, who plays with R.R. and is being raised like a sibling. Arina explained that R.R. would have a "really good school education" in Moscow. Arina described their home as "really lived in[]" with lots of family pictures and Roberto's home as a "much less friendly

environment" that would be difficult for a child because "if you like, scratch the wall, it would be a problem for sure."

Arina explained she had been with Roberto about fifteen times for a period of two weeks or a month each time, and she observed his behavior change over time. Arina testified that during their trip to Courchevel, Roberto was withdrawn, "zoned out," and "wouldn't really come out of the house much[.]" Arina stated that Sofia organizes FaceTime visits with Roberto a few times a day and "emphasize[d] that it's really important that we connect them[]" when she is away. Arina believed that Sofia wants Roberto to be involved in R.R.'s life and is fully committed to ensuring that they see one another, and their parents are supportive and will help Roberto see R.R. Arina explained that being a mother comes naturally to Sofia, who is intuitive and excited to spend time with R.R. Arina testified that R.R. is happy and healthy. Arina testified that she is a United States citizen because she was born here while her parents were visiting in New York. Arina agreed that she would travel with R.R. to the United States to visit Roberto.

Sofia's Testimony

After being recalled to the stand, Sofia testified that in 2015, Roberto told her about his life in Venezuela and that there had been an attempt on his father's life. Sofia testified that Roberto "made it very clear that he has been fearful for his life pretty much all his life that he can remember, all of his family members." Sofia

43

explained that she continued the relationship because she loved Roberto and wanted to be supportive. Sofia testified that when she was living with Roberto's parents in December 2015, Roberto called her and told her his father had been arrested and to stay in the room and not leave home. Sofia stated that she went downstairs when she heard Roberto's mother screaming and saw five undercover vehicles and seven to ten people wearing bulletproof FBI vests walking around. Sofia testified she "was freaking out[,]" and Roberto's father went to jail for eight months and pleaded guilty.

Sofia explained that after he pled guilty, she felt a "little bit relieved[]" and thought things would be over, but after she married Roberto and became pregnant, Roberto told her his mother and older brother were arrested in Spain. Sofia testified that she was afraid of being harmed even before Roberto told her that his father was cooperating with the United States government against his co-conspirators in Venezuela to have them prosecuted. Sofia stated that Roberto told her that the people his father was "snitching" on "are not going to be happy about it, that it's going to be a big issue with all these people from Venezuela - - I mean, they might seek revenge." Sofia testified she was scared for herself, R.R., and the entire family. Sofia explained that when she texted Roberto and said that his family is poison, she meant she "wanted a clean slate" for Roberto, herself, and R.R.

Sofia testified that she did not intend to take R.R. to Russia when they went to Courchevel, and at that point, she wanted the relationship to work out. Sofia

44

explained that there was no communication between them, and Roberto could not go to couple's therapy or admit he was taking hydrocodone. Sofia testified that she did not want to leave Roberto alone with R.R. because of his hydrocodone issues and that Roberto did not drive alone with R.R. Sofia testified that she did not abduct R.R. and claimed that Roberto abandoned them in France. Sofia explained that while she initially expressed her fear and frustrations about the Ukraine dispute to Roberto, she had not really observed any changes in Russia since it started.

Sofia believed that she should be R.R.'s managing conservator because she loves R.R., has been his primary caretaker since birth, plans to continue to provide R.R. with stability and routine with her family's support and encourage his relationship with Roberto. When asked if she and Roberto had an agreement that neither of them would take R.R. away from the other and move to a foreign country without discussing and letting the other party know, Sofia testified, "Not that I'm aware of." Sofia explained that "[w]e never had any kind of agreement to that effect." When asked if she was denying that Roberto said they had an agreement to that effect on FaceTime, Sofia testified that she didn't "even know what conversation we're talking about." Sofia denied telling Roberto that her lawyers told her it was impossible to tell him she was leaving for Russia.

Roberto's counsel played a twenty-second excerpt from an audio recording as rebuttal evidence. The jury heard the following recording:

[Roberto]: "That's exactly what you didn't do, you know? So . . ."

[Sofia]: "Yeah. In the end of the day, after I talked to my lawyer, I realized that that's not a possibility."

[Roberto]: "The - - when?"

[Sofia]: "After I talked to my lawyers, I realized that that wasn't an option anymore."

After considering the evidence, the jury found that grounds exist for divorce and appointed Sofia as the sole managing conservator of R.R. The record shows that during jury deliberations, the trial court instructed the jury that it was not permitted to answer its questions about whether there was evidence suggesting Sofia would make things difficult for Roberto if he pursued his lawsuit in the United States and whether there was evidence of armed guards in Carlton Woods.

## Bench Trial Regarding Possession and Access

Following the jury trial, the trial court conducted a bench trial on the issues of possession of and access to the child. The parties made arguments without presenting additional testimony. Roberto's counsel requested that the trial court: appoint Roberto possessory conservator with all the rights and duties; grant standard possession over a hundred miles and order all periods of possession to take place in

Montgomery County; order daily electronic communication for one hour per day; subject Sofia to a geographical restriction of Moscow, Russia or Montgomery County; grant Roberto visitation for the entire summer and spring break every year to make up for not seeing R.R. for the past two and a half years; and allow Roberto to voluntarily drug test before visitation. Sofia's counsel objected to the request for a geographical restriction, arguing that it was not pleaded, Sofia withdrew her request for joint managing conservatorship, and stipulated to it. Sofia's counsel asked the trial court to make provisions to allow Roberto to "stairstep" into R.R.'s life; order all visitation periods to occur in Russia until the age of seven or alternatively in Monaco or Dubai; require Roberto to have a Russian translator during visitation; enjoin Roberto from operating a motor vehicle while taking hydrocodone; and order drug testing once every three months to determine his hydrocodone dose.

After a discussion between the parties and the trial court, the trial ordered the parties to mediate and settle the possession and access issues, and if they failed to reach an agreement, the trial court stated it would rule on those issues. The trial court took the matter under advisement and deferred its ruling. Following the bench trial, the trial court asked the parties to submit proposed step-up visitation schedules for the court's consideration.

<u>Trial Court's Ruling on Possession and Access</u>

After the parties failed to reach an agreement regarding the issue of possession and access, the trial court ordered the parties to comply with the terms and conditions of a Modified Standard Possession Order. The trial court found that the following orders for possession and access to the child are in the best interest of the child:

1. The court finds that it is in the best interest of the child for the father of the child to be awarded a step-up possession order that leads up to a modified standard possession order, deviating from a standard possession order only to the extent is necessary to protect the child's best interest. . . . The court makes this ruling pursuant to Sections 153.253 and 153.256 of the Texas Family Code, and the case law attendant thereto. The court further makes its ruling under TFC 153.257, and finds that good cause for the restrictions on the means of travel are contained in the record from trial, and the court finds that those restrictions contained in this rendition of judgment are in the best interest of the child.

2. . . .

   **Place of Possession, Notice and Travel with Child (beginning from June 24, 2022 through June 1, 2023, excepting Spring Break 2023):** IT IS ORDERED that all periods of possession in this Modified Standard Possession Order beginning on the date of this rendition of judgment until June 1, 2023, except as otherwise provided herein for Spring Break 2023, shall take place at one of the following three locations selected by ROBERTO RINCON: Dubai, Monaco, or Nice, France, or any other location the parties agree to in writing at least thirty (30) days prior to the scheduled period of possession. IT IS ORDERED that ROBERTO RINCON shall give thirty (30) days' advance written notice to SOFIA BEREZKINA of the city where he will exercise his period of possession, limited to the above three locations, for all non-extended summer periods of possession.

   For Spring Break 2023, ROBERTO RINCON shall not be limited to one of the three locations listed above, and shall pick up and return the child from the airport in Nice, France.

48

**Place of exchange of child beginning June 1, 2023 forward (and including Spring Break 2023):** IT IS ORDERED that the exchange of the child for all periods of possession beginning June 1, 2023 forward shall take place at the Nice, France airport.

3. . . .

**General Terms and Conditions beginning June 1, 2023 (and including Spring Break 2023):**

Surrender of Child by SOFIA BEREZKINA—SOFIA BEREZKINA is ordered to surrender the child to ROBERTO RINCON at the beginning of each period of possession at the airport in Nice, France.

. . .

4. Standard language regarding passports and international travel information shall be included in the final order in this suit.

5. Each party is responsible for the cost of his/her own costs of travel to the location for exchange of the child, including any hotel costs associated with the periods of possession. SOFIA BEREZKINA is responsible for the travel costs of the child necessary to get the child to the exchange location set forth in this Decree. ROBERTO RINCON is responsible for the travel costs of the child necessary to return the child to the exchange location set forth in this Decree, and for any other travel costs incurred on behalf of the child while in possession of the child.

6. An interlocutory final decree of divorce shall be prepared by Mr. Rincon's attorneys reflecting this ruling and any stipulations previously made. Decree is granted on insupportability and cruel treatment by the parties against one another. . . .

In its Modified Standard Possession Order the trial court also granted a permanent injunction enjoining Roberto from operating any motor vehicle in which R.R. is a passenger.

49

The trial court's Interlocutory Order incorporated the jury's verdict appointing Sofia as the sole managing conservator of R.R. and its Modified Standard Possession Order. Roberto filed objections to Sofia's Proposed Final Decree Of Divorce as to Parent Child Issues and Motion to Reconsider complaining about, among other things, the trial court's deviation from the SPO. Roberto complained the Proposed Final Decree failed to comply with section 153.361 of the Texas Family Code, which requires the possessory conservator to surrender the child after his periods of possession at the possessory conservator's residence.

The trial court signed a Final Decree of Divorce that incorporated its Interlocutory Order by reference and ordered the parties to comply with the terms and conditions of the Modified Standard Possession Order, including the requirement that the parties surrender the child after each period of possession at the Nice, France airport, unless otherwise agreed to in writing by the parties. Roberto requested Findings of Fact and Conclusions of Law.

<u>Findings of Fact and Conclusions of Law</u>

The trial court issued Findings of Fact and Conclusions of Law on the issues tried before the court–the geographical restriction, possession, and access. The Findings of Fact and Conclusions of Law relevant to this appeal, include:

**Findings of Fact**

- A jury was selected, questions of fact were submitted to the jury, and a verdict was returned and duly filed. The jury found that a ground exists

50

for the court to grant a divorce, and found that SOFIA BEREZKINA should be the sole managing conservator of the child.

- As a result of the jury's findings, the Court was bound to award the rights and duties of a sole managing conservator to SOFIA BEREZKINA, and the rights and duties of a possessory conservator to ROBERTO RINCON. The issue of rights and duties was not tried to the court, except as to whether a geographical restriction should be placed on the sole managing conservator.

- On or about May 31, 2022, the attorneys for the parties appeared for the bench portion of the trial. Respondent appeared in person, and Petitioner failed to appear except for through his attorney despite it being final trial. A stipulation and agreement pursuant to rule 11 of the Texas Rules of Civil Procedure was made on the record that Petitioner's income exceeds the maximum cap on guideline child support and should be calculated accordingly, and that Petitioner would continue to maintain health and dental insurance for the child, and that his obligations would begin July 1, 2022. The parties further agreed that the parties would split uninsured medical insurance 50% each. The court found that the stipulations were in the best interest of the child and incorporated those agreements into the "Interlocutory Order" that was made final after the parties arbitrated and then settled by Rule 11 the property issues remaining in the case, and a Final Decree of Divorce was signed merging the two Orders into one final appealable Order.

- Neither party presented any evidence contrary to the agreements that were made on the record prior to the rendering of judgment and signing of the Interlocutory Order on July 21, 2022. The court accepted and adopted the parties agreements child support, health insurance, and dental insurance and those agreements were made a part of the court's rendition of judgment when the Interlocutory Order was signed. Those agreements became part of the final judgment when the Final Decree of Divorce was signed on October 13, 2022.

**Findings of Fact–Geographical Restriction**

- At the time of divorce, Petitioner and Respondent were the parents of the following child: [R.R.], Male, born on January 7, 2019.

51

- At the time of trial, the child had lived in Moscow, Russia with SOFIA BEREZKINA since January 2020, or approximately 2 years and 5 months.

- ROBERTO RINCON testified that he had not traveled to Russia to visit the child since January 2020.

- SOFIA BEREZKINA testified that she had been domiciled in Moscow, Russia since January 2020.

- ROBERTO RINCON testified that he was born in Venezuela and held American and Venezuelan passports.

- SOFIA BEREZKINA testified that she was born in Russia and held Russian, Croatian and Cypriot passports.

- SOFIA BEREZKINA testified that she was unable to obtain residence in the United States. ROBERTO RINCON testified that he did not feel safe traveling to Russia to see the child.

- On May 31, 2022, Petitioner, ROBERTO RINCON, submitted a brief supporting the Court's authority to impose a geographical restriction on SOFIA BEREZKINA's exclusive right to designate the primary residence of the child after the jury determined that she should be appointed sole managing conservator.

- The Court considered whether a geographical restriction is in the best interest of the child and determined it was not in the best interest of the child.

- SOFIA BEREZKINA presented credible evidence regarding the child's current stable and supportive environment.

- SOFIA BEREZKINA presented credible evidence regarding the beneficial qualities of the child's daycare, daily activities, and frequent involvement and immediate and extended family members.

- SOFIA BEREZKINA's father, Grigory Berezkina [sic], provided credible testimony confirming the child's current stable and supportive environment and close relationships with maternal grandparents, aunts, uncles, and cousins living near his current residence.

- SOFIA BEREZKINA's father, Grigory Berezkina [sic], provided credible testimony regarding ROBERTO RINCON'S change in behavior that he attributed to ROBERTO RINCON'S known use of controlled substances.

- SOFIA BEREZKINA's father, Grigory Berezkina [sic], provided credible testimony regarding his concerns about the safety of the child under ROBERTO RINCON's care while ROBERTO RINCON was using prescription hydrocodone three times a day.

**Findings of Fact–Possession–Family Code § 153.258**

- The terms of possession and access were determined by the Court.

- SOFIA BEREZKINA presented credible evidence contradicting the presumption that the Standard Possession Order is in the best interest of the child.

- SOFIA BEREZKINA provided credible testimony as to her concerns regarding ROBERTO RINCON's use of prescription drugs, specifically hydrocodone taken three times a day.

- ROBERTO RINCON's medical records demonstrate that ROBERTO RINCON has at times used narcotics in excess of the amount disclosed to medical professions, obtaining controlled substances in another country without informing his prescribing doctor in the United Sates of same.

- SOFIA BEREZKINA provided credible testimony as to her concerns regarding the effect of ROBERTO RINCON's medications on his ability to contribute to the child's caretaking.

53

- ROBERTO RINCON'S psychiatrist, Dr. Andreea Andrei testified that ROBERTO RINCON told her that he had been taking 3 hydrocodone pills a day for 6 years.

- The Court finds that a permanent injunction enjoining ROBERTO RINCON from operating a motor vehicle while in possession of the child, due to his daily hydrocodone, is required to protect the best interest of the child.

- ROBERTO RINCON had limited contact with the child during the two and a half years preceding trial and had not traveled to Russia nor to a nearby country to visit with the child during that two year period, despite Respondent's invitation [] for him to do so.

- The child was 3 years and 5 months old at the time of trial, and had not physically been in the presence of the Petitioner for over two years. The only contact the child had with Petitioner during the two years preceding the trial date was through electronic communication.

- A limited possession schedule that incrementally "steps up" to a modified possession order supports the child's need to develop healthy attachments to both parents before significant periods of separation from his primary caretaker, and to help the child adjust to spending time with a parent he had not physically been with for two years,

- SOFIA BEREZKINA and ROBERTO RINCON live nearly 6,000 miles apart.

- SOFIA BEREZKINA's ability to obtain a visa to travel to the United States with the child is not guaranteed, and the current tensions between Russia and the United States do not help that situation. ROBERTO RINCON has concerns for his own safety as to traveling to Russia to see the child due to the tension between Russia and the United States. The only way to guarantee ROBERTO RINCON'S safety while protecting the best interest of the child is to provide a step-up possession schedule that takes place in neighboring countries into which Petitioner, as a well-traveled affluent individual, could easily and safely travel.

- To allow Petitioner to elect 1st, 3rd, and 5th weekends for parents residing more than 100 miles apart would not be in the best interest of the child because Petitioner does not wish to travel to Russia to visit the child due to his own safety concerns and in order to accommodate those concerns, Respondent will have to travel with the child to selected foreign countries located less than four hours from the residence of the child. Having the child travel eight hours in one weekend three times a month is not in the best interest of the child.

- Restricting period of possession during the child's school year to a location close in proximity to the child's residence, supports the child's need for continuity of routine and is in the best interest of the child.

- The Court finds that good cause for the restriction on means of travel are contained in the trial record and that such restrictions are in the best interest of the child.

- On June 14, 2022, the Court sent an email to the attorneys instructing them to provide to the court a proposed possession order in accordance with certain parameters no later than by June 17, 2022. Only Respondent's attorney provided a proposed step-up possession and access schedule to the court by the deadline given by the court. Petitioner did not provide a proposed step-up possession and access for the court to consider, and merely filed objections to Respondent's proposal. The court never received a proposed step-up possession and access schedule from Petitioner and never received any evidence from Petitioner at all on that issue.

- The possession and access provisions rendered by the Court are in the best interest of the child and are supported by the evidence.

**Conclusions of Law–Geographic Restriction**

- It is not in the best interest of the child for Respondent SOFIA BEREZKINA to have a geographic restriction.

## Conclusions of Law–Possession and Access

- It is in the best interest of the child for ROBERTO RINCON to be awarded a step-up possession order that leads up to a modified possession order, deviating from a standard possession order only to the extent necessary to protect the child's best interest. The parties' agreements concerning electronic access to the child are in the best interest of the child.

The trial court denied Roberto's request for additional Findings of Fact and Conclusions of Law about the trial court's variation of the SPO, including the requirement that he surrender the child overseas instead of at his residence in Montgomery County. Roberto filed a Motion for New Trial complaining the trial court abused its discretion by allowing evidence about his family's criminal history in violation of the Agreed Order and imposing several restrictions on his possession of and access to the child without sufficient evidence to support the restrictions that deviate from the SPO. Roberto also complained the jury's verdict appointing Sofia as the sole managing conservator of the child was against the great weight and preponderance of the evidence and manifestly unjust. Roberto argued that the admission of the highly prejudicial evidence about his family's criminal history confused the jury and skewed the results of the jury trial. The trial court denied Roberto's Motion for New Trial.

Roberto also filed a Motion to Modify, Correct, or Reform the Judgment, incorporating his prior objections to the Proposed Final Decree, complaining about his burden to travel overseas to exercise possession and the provision requiring him

56

to exercise 80% of his periods of possession or forfeit all possession, and requesting the correction of a drafting error. Sofia filed a Response, agreeing to the removal of the 80% provision and correction of the error. The trial court partially granted Roberto's Motion to Modify, Correct, or Reform the Judgment by removing the 80% provision and making the agreed correction in its Reformed Interlocutory Order and Revised Final Decree of Divorce.

Roberto appealed the Revised Final Decree of Divorce incorporating its Reformed Interlocutory Order. Sofia filed a Notice of Cross-Appeal regarding the trial court's denial of her Amended Plea to the Jurisdiction, Request to Decline Jurisdiction for Inconvenient Forum, Notice of Authority to Enforce Foreign Order, and Motion to Dismiss.

## ANALYSIS

### Modified Standard Possession Order

In issue one, Roberto complains the trial court abused its discretion by deviating from the SPO in the Texas Family Code and ordering him to surrender the child in France instead of his residence in Montgomery County, where he and Sofia lived during the six-month period preceding Roberto's filing for divorce. Roberto argues the trial court's Modified Standard Possession Order requiring him to surrender the child after his periods of possession in France fails to comply with section 153.316 in the Family Code, which requires the possessory conservator to

surrender the child to the managing conservator at the end of each period of possession at the possessory conservator's residence. *See* Tex. Fam. Code Ann. § 153.316(3). Roberto argues the evidence was insufficient to support the trial court's findings that a deviation from the SPO was in the child's best interest. Roberto also complains that the possession order places a vastly disproportionate cost and burden on him to travel overseas to exercise his possession with the child and violates the intent of section 153.316 to have the parties share the burden, especially since Sofia chose to move to Moscow. Roberto maintains that the parties are wealthy and there is no serious disparity between the parties' respective incomes to justify his disproportionate travel burden when his travel time is twice as much as Sofia's.

We review a trial court's ruling on possession and access for an abuse of discretion. *Moreno v. Perez*, 363 S.W.3d 725, 737(Tex. App.—Houston [1st] 2011, no pet.). A trial court abuses its discretion when it rules without reference to guiding rules or principles or when its decision is unreasonable or arbitrary. *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022). The abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *Zeifman v. Michels*, 212 S.W.3d 582, 587–88 (Tex. App.—Austin 2006, pet. denied). Consequently, the legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *A.S. v. Texas Dep't of Fam. & Protective Servs.*,

665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.). The reviewing court determines first "whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion." *Id.*; *see DiBassie v. DiBassie*, No. 09-20-00287-CV, 2022 WL 16973693, at \*10 (Tex. App.—Beaumont Nov. 17, 2022, pet. denied) (mem. op.).

When a party attacks the legal sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citation omitted); *see DiBassie*, 2022 WL 16973693, at \*9. In reviewing the legal sufficiency of a challenged finding, we consider the evidence "in the light most favorable to the verdict, and indulge every reasonable inference that would support" that finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "But if the evidence allows of only one inference," we may not disregard the evidence when deciding whether legally sufficient evidence supports the challenged finding. *Id.*

We review the trial court's findings of fact for factual sufficiency of the evidence under the same legal standards as applied to review jury verdicts for factual sufficiency of the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of the evidence on an issue on which he had the burden of proof, "[]he must demonstrate on appeal that the adverse finding is

against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. In a factual sufficiency review, we examine all the evidence and view it in a neutral light. *See id.* But unless the evidence is so weak or the trial court's finding is clearly wrong and unjust given the great weight and preponderance of the evidence, we cannot set the finding the appellant challenges aside when resolving the appeal. *Id.* at 242. In other words, we cannot substitute our judgment for the factfinder's if the evidence supports the challenged finding. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (discussing factual sufficiency); *see also In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005) (discussing legal sufficiency).

In a bench trial, where the trial court makes findings of fact, those findings are the equivalent of jury answers to special issues. *In re H.N.T.*, 367 S.W.3d 901, 903 (Tex. App.—Dallas 2012, no pet.). Unchallenged findings are binding on this Court unless no evidence supports the finding, or the contrary is established as a matter of law. *Id.* If requested by a party, section 153.258 in the Family Code requires a trial court to "state in writing the specific reasons for the variance from the standard order." Tex. Fam. Code Ann. § 153.258(a). The trial court "has no duty [to] make additional or amended findings that are unnecessary or contrary to its judgment; a trial court is only required to make additional findings and conclusions that are appropriate." *Vickery v. Comm'n for Law. Discipline*, 5 S.W.3d 241, 254 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). "As long as some evidence of

a substantive and probative character exists to support the trial court's judgment, we will not substitute our judgment for that of the trial court." *In re H.N.T.*, 367 S.W.3d at 903.

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002. In the absence of an agreement by the parties, when the possessory conservator resides more than 100 miles from the residence of the child, the Family Code provides a SPO to set out the possessory conservator's right to possession of the child. *See id.* §§ 153.311, 153.313, 153.316, 153.317. When the possessory and managing conservators lived in the same residence at any time during the six-month period preceding the date a suit for dissolution of marriage was filed and the possessory conservator's county of residence remains the same and the managing conservator's changes after they no longer live in the same residence, the SPO requires the possessory conservator to surrender the child to the managing conservator at the end of each period of possession at the possessory conservator's residence. *See* Tex. Fam. Code Ann. § 153.316(3)(B)(ii). A trial court has wide discretion to determine the child's best interest when establishing terms and conditions of conservatorship and possession. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (explaining trial court has "wide latitude" in

61

determining child's best interest and may impose any conditions it finds necessary to protect that interest); *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied) (stating trial court is given wide latitude in determining a child's best interest because it is in the best position to observe the witnesses and their demeanor).

We review best interest determinations in the conservatorship context using the factors the Texas Supreme Court identified in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). *V.M. v. Tex. Dep't of Fam. & Protective Servs.*, 681 S.W.3d 465, 474 (Tex. App.—Austin 2023, no pet.). The *Holley* factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. This list is not exhaustive, and a trial court need not have evidence on every factor to make a valid finding about the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

The SPO in the Family Code "sets the minimum possessory rights of the parent who does not have the right to establish the child's primary residence." *Kazmi v. Kazmi*, 693 S.W.3d 556, 576 (Tex. App.—Austin 2023, pet. denied); *see generally* Tex. Fam. Code Ann. §§ 153.3101–.3171 (codifying terms and requirements associated with SPOs); *see generally also id.* § 153.316 (setting forth general terms and conditions for SPOs). "The guidelines established in the [SPO] are intended to guide the courts in ordering the terms and conditions for possession of a child by a parent named as a possessory conservator[.]" Tex. Fam. Code Ann. § 153.251(a). There is a rebuttable presumption that the SPO is in the best interest of the child. *Id.* § 153.252(2); *Kazmi*, 693 S.W.3d at 575. That said, a trial court may deviate from the SPO if there is sufficient evidence to rebut the presumption. *See In re N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.). In deviating from the SPO, the trial court may consider "(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor." Tex. Fam. Code Ann. § 153.256. The terms of a possession order that deviate from the SPO "may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193; *In re J.J.R.S.*, 627 S.W.3d at 218–19. A trial court may deviate from the SPO by restricting or placing conditions on a parent's possession and access if the record contains evidence to support its finding that such

restrictions or conditions are in the child's best interest. *Warner v. Troutman*, No. 01-23-00587-CV, 2024 WL 3349097, at *11 (Tex. App.—Houston [1st Dist.] July 9, 2024, no pet.) (mem. op.).

The issues of possession and access were tried to the bench, and as the ultimate finder of fact in a bench trial, the trial court is in a better position to observe the parties' demeanor and credibility and evaluate their claims. *See Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.); *In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied). We defer to the trial court's fact-finding determinations so long as they are not unreasonable. *In re A.B.*, 412 S.W.3d 588, 592 (Tex. App. —Fort Worth 2013) (op. on reh'g), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

The trial court heard testimony regarding Sofia's and Roberto's ability to care for R.R., the effect of Roberto's hydrocodone use and its potential effect on his parenting abilities, R.R's current and future emotional and physical needs, any potential current and future danger to R.R., Sofia's support from her family and staff, the school and programs R.R. was currently enrolled in, Sofia's and Roberto's future plans for R.R., the stability of R.R.'s current home in Moscow, the stability of Roberto's home in The Woodlands, the influence and potential danger that R.R.'s grandparents posed to his safety and well-being, the parties' financial situations,

64

their past and current ability to travel internationally, and their concerns about traveling to facilitate visitation with R.R. *See Holley*, 544 S.W.2d at 371–72.

The trial court issued Findings of Fact and Conclusions of Law in which it made findings in support of its decision to deviate from the SPO, as required by section 153.258 of the Family Code. *See* Tex. Fam. Code Ann. § 153.258(a) (stating that on a party's request, the trial court shall state in writing the specific reasons for the variance from the SPO). The trial court found that its deviating from the SPO only as needed was to protect R.R.'s best interest. Specifically, the trial court found that Sofia had been domiciled in Russia, lived there for approximately two years and five months, could not obtain residence in the United States, and was not guaranteed to obtain a visa to travel to the United States. The trial court found that Sofia presented credible evidence about R.R.'s current stable and supportive environment, the beneficial qualities of R.R.'s school and activities, Roberto's use of hydrocodone three times a day, and her concerns about the effect of Roberto's medications on his parenting ability. The trial court also found that Grigory presented credible testimony regarding Roberto's change in behavior due to his use of controlled substances, his concern about Roberto taking hydrocodone three times per day, and his concern about R.R.'s safety while under Roberto's care. The trial court found that Sofia presented credible evidence contradicting that the SPO is in R.R.'s best interest.

65

Concerning Roberto, the trial court found that Roberto was born in Venezuela, had an American passport, did not feel safe traveling to Russia to see R.R., and only had limited electronic communication with R.R. for the past two and a half years. The trial court found that Roberto's psychiatrist testified that Roberto took three hydrocodone pills a day and that Roberto's medical records show he used narcotics in excess of the amount he disclosed to his doctor and obtained controlled substances in a foreign country without notifying his doctor.

The trial court found that a limited possession schedule that "steps up" to a modified possession order supports R.R.'s need to develop an attachment to Roberto before separating him from Sofia for any significant period. The trial court found that Roberto had safety concerns of traveling to Russia and was a "well-traveled affluent individual" who "could easily and safely travel[]" to neighboring countries to exercise his periods of possession. The trial court found that it was in R.R.'s best interest that Sofia travel with R.R. to foreign countries located less than four hours from her Moscow residence for Roberto's weekend visitations during the school year. In its Reformed Interlocutory Order, the trial court ordered Roberto to surrender R.R. at the beginning of each period of possession at the airport in Nice, France unless otherwise agreed to in writing by the parties.

Based on the evidence the trial court considered in resolving the parties' issues of possession and access, we conclude Roberto has not established the trial court

abused its discretion by deviating from the SPO. The trial court heard evidence that both rebutted the presumption that a SPO was in R.R.'s best interest and supported its conclusion that it was in R.R.'s best interest for Roberto to be awarded a stepped-up possession order that leads to a Modified Standard Possession Order that deviates from a SPO and includes surrendering the child in France. *See In re K.L.M.*, No. 13-19-00057-CV, 2020 WL 373067, at \*\*2-5 (Tex. App.—Corpus Christi Jan. 23, 2020, pet. denied) (mem. op.). Therefore, we conclude the trial court did not abuse its discretion by deviating from the SPO and setting France as the location for Roberto to surrender R.R. because there is some evidence of a substantive and probative character to support its decision, and based on that evidence, the trial court's decision was reasonable. *See In re H.N.T.*, 367 S.W.3d at 903; *DiBassie*, 2022 WL 16973693, at \*12. We overrule issue one.

## Injunction

In issue two, Roberto complains the trial court abused its discretion by enjoining him from operating a motor vehicle with R.R. during his periods of possession. Roberto argues there was no pleading for injunctive relief concerning his driving and insufficient evidence to support such an overbroad restriction on his exercise of possession and his liberty interest. Roberto complains he had no notice of the need to put on testimony regarding his ability to drive while taking his prescription medications because Sofia first requested the injunction during closing

67

arguments in the bench trial. Roberto contends the issue was not tried by consent despite his elicitation of testimony that he often drove R.R. and Sofia, who never objected to him driving, because evidence of him being a safe driver was relevant to other issues raised by the pleadings. According to Roberto, there was no testimony regarding his ability to drive while taking his current dose of medication.

Roberto asserts that the trial court abused its discretion because under the Texas Rules of Civil Procedure, the judgment must conform to the parties' pleadings. Tex. R. Civ. P. 301. That said, "[i]n child custody cases, where the best interests of the child are the paramount concern, technical pleading rules are of reduced significance." *Messier v. Messier*, 389 S.W.3d 904, 907 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied) (holding that a trial court can place conditions on visitations even when such conditions were not requested in the pleadings); *see also Cain v. Cain*, No. 14-07-00115-CV, 2007 WL 4200638, at *4 (Tex. App.—Houston [14th Dist.] Nov. 29, 2007, no pet.) (mem. op.) ("[T]he trial court's efforts to exercise broad, equitable powers in determining what will be best for the future welfare of a child should not be hampered by narrow technical rulings."). Thus, it does not matter that Sofia did not specifically request that Roberto be restricted from driving with R.R. *See In re K.L.M.*, 2020 WL 373067, at *5. The trial court may

unilaterally impose conditions not requested and does not abuse its discretion as long as it does not act arbitrarily. *See id.*; *In re H.N.T.*, 367 S.W.3d at 903.

During the jury trial, the trial court heard evidence of Roberto's daily use of hydrocodone. Roberto testified to taking three hydrocodone pills every day since 2014, and he agreed that Kwoh's medical records show he underreported his daily dosage and failed to report getting other painkiller prescriptions and Xanax. Roberto explained he intended to continue taking three doses of hydrocodone daily. Roberto testified that Sofia complained about his use of hydrocodone and demanded that he go to a rehabilitation program, but he denied that taking hydrocodone would impact his ability to care for R.R. Although Sofia complained to both of Roberto's siblings about his use of hydrocodone, neither Alexandra nor Ricardo knew about Roberto's recent pain and use of hydrocodone.

Dr. Kwoh testified that he had been prescribing Roberto hydrocodone for years and although Roberto reported at times that he did not use more than two doses per day, his prescription refill records show he averaged three pills per day. Kwoh testified that all of Roberto's opioid prescriptions came from him, except for one from Dr. Choi, and Choi testified that he prescribed Roberto opioids for short term after a surgery. Kwoh explained the side effects of hydrocodone included drowsiness and blurred vision. Kwoh also explained there is always a risk a person can lose the normal use of their mental and physical abilities and become intoxicated by taking

opiates, and that a person should not be operating heavy machinery when taking significant doses that affect their reflexes. Kwoh agreed that, depending on the dose, a person could become impaired and should not operate a motor vehicle. Kwoh planned for Roberto to maintain his current regimen of hydrocodone for the foreseeable future. Kwoh also testified that he prescribed Roberto anxiety medication, was unaware that Roberto had obtained Xanax out of the country and had discouraged the use of benzodiazepine. Dr. Andrei, who also prescribed Roberto's medications, testified that she was concerned about potential physical side effects from Roberto's reported long-term treatment with opiates.

Sofia testified that when she found out Roberto was taking hydrocodone, she demanded that he stop. Sofia explained that she realized Roberto was still taking hydrocodone because of his symptoms, which included a rapidly changing temper, aggressiveness, and "constant sleepiness during the day, and [he didn't] have a will to do anything at all[.]" Sofia explained Roberto was getting prescriptions for pain pills from Dr. Kwoh and Dr. Armas and that she was concerned about his long-term use of hydrocodone and use of medications without a prescription. Sofia testified that Roberto refused to seek rehabilitation, and she was afraid to leave Roberto alone with R.R. According to Sofia, Roberto did not drive alone with R.R. Sofia testified that during the six months prior to her moving to Russia, Roberto would "basically lay on the couch and in and out of sleep and watch TV series." Grigory testified that

70

during their last trip to Courchevel, Roberto was detached, slept and napped, and he did not believe Roberto could be R.R.'s primary caregiver if he is detached. Arina had also observed a change in Roberto's behavior during the trip and described him as being withdrawn and zoned out.

During the bench trial, Sofia requested that the trial court enjoin Roberto from operating a motor vehicle while taking hydrocodone. The trial court's Revised Final Decree incorporating its Reformed Interlocutory Order permanently enjoined Roberto from operating any motor vehicle in which R.R. is a passenger. The trial court found that Sofia presented credible evidence about her concerns of Roberto's use of hydrocodone and other prescription drugs, that Roberto's medical records show that he exceeded his prescribed amounts at times by getting hydrocodone from other doctors, and that he obtained a controlled substance in another country without informing his prescribing doctor. The trial court found that Sofia provided credible evidence on the effects of Roberto's medications on his ability to care for R.R. The trial court also found that an injunction enjoining Roberto from operating a motor vehicle while in possession of R.R., due to his daily use of hydrocodone, is required to protect R.R.'s best interest.

We find that sufficient evidence supports the trial court's driving restrictions placed on Roberto which prevent him from operating a motor vehicle in which R.R. is a passenger, as well as the trial court's finding that the restrictions are in R.R.'s

best interest. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating parent's use of narcotics and its effect on his ability to parent may qualify as an endangering course of conduct); *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (stating parent's substance abuse endangers children's physical and emotional well-being because it exposes them to parent's risk of impairment); *Warner*, 2024 WL 3349097, at *12; *In re J.B.C.*, No. 09-22-00005-CV, 2022 WL 2438174, at *9 (Tex. App.—Beaumont July 5, 2022, no pet.) (mem. op.) (stating mother's abuse of prescription drugs endangered the child); *In re S.I.-M.G.*, No. 02-12-00141-CV, 2012 WL 5512372, at *10 (Tex. App.—Fort Worth Nov. 15, 2012, no pet.) (mem. op.) (stating mother's use and abuse of prescription drugs endangered the child); *In re T.D.L.*, No. 02-05-250-CV, 2006 WL 302126, at **7–8 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (considering mother's continuous misuse of prescription drugs as endangering the child); *see also Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical danger to child as best interest factor).

Based on this record, we conclude the trial court did not abuse its discretion in enjoining Roberto from operating a motor vehicle in which R.R. is the passenger because the trial court could have reasonably concluded that such a severe restriction was reasonably necessary to protect R.R.'s best interest. *See* Tex. Fam. Code Ann. § 153.193 (providing trial court's restrictions or limitations on a parent's right to

72

possession of or access to a child may not exceed those that are required to protect the child's best interest); *In re J.J.R.S.*, 627 S.W.3d at 220–21; *In re C.T.H.*, No. 05-22-01202-CV, 2024 WL 5232862, at \*4–5 (Tex. App.—Dallas Dec. 27, 2024, no pet.) (mem. op.). We overrule issue two.

Admission of Evidence about Alleged Criminal History of Roberto's Family

In issue three, Roberto argues the trial court abused its discretion by allowing testimony concerning R.R.'s paternal grandparents' non-violent, white-collar criminal history in violation of the parties' Agreed Order to exclude such testimony. According to Roberto, the Agreed Order shows the parties agreed the evidence was irrelevant and prejudicial. Roberto argues that testimony concerning the paternal grandparents' criminal history is irrelevant to R.R.'s best interest in determining conservatorship, possession, and access because it does not implicate any of the *Holley* factors. Roberto also argues that even if the testimony was relevant, its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues by piling one presumption upon another to show potential and speculative harm to R.R. due to Roberto's family members' criminal charges. According to Roberto, the testimony was highly prejudicial and probably caused the rendition of an improper judgment.

We review a trial court's ruling admitting or excluding evidence under an abuse of discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

73

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. The fact that evidence has some prejudicial effect is insufficient to warrant its exclusion. *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 772 (Tex. App.—Corpus Christi 1999, pet. denied). To be excluded, evidence must not only create a danger of unfair prejudice, but that danger must substantially outweigh its relevance. *See* Tex. R. Evid. 403; *In re A.D.*, 474 S.W.3d 715, 727–28 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The decision to admit or exclude evidence subject to a Rule 403 objection lies within the sound discretion of the trial court. *Decker v. Hatfield*, 798 S.W.2d 637, 639 (Tex. App.—Eastland 1990, writ dism'd w.o.j.). Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Murray v. Tex. Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 368 (Tex. App.—Austin 2009, no pet.).

"To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). In

74

conducting this harm analysis, we review the entire record. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995); *Benavides*, 189 S.W.3d at 879. Evidentiary rulings do not usually cause reversible error unless an appellant can demonstrate that the judgment turns on the particular evidence that was admitted or excluded. *Able*, 35 S.W.3d at 617; *Alvarado*, 897 S.W.2d at 753–54; *Benavides*, 189 S.W.3d at 879.

"A party opens the door to otherwise objectionable evidence offered by the other side when it introduces the same evidence or evidence of a similar character." *See Campbell v. Pompa*, 585 S.W.3d 561, 585 (Tex. App.—Fort Worth 2019, pet. denied); *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000) (stating party may open door to admission of otherwise objectionable evidence through witness's testimony that conveys false impression); *Trans-State Pavers, Inc. v. Haynes*, 808 S.W.2d 727, 732 (Tex. App.—Beaumont 1991, writ denied) ("It is clear that once appellees opened the door to the introduction of such evidence, that the trial court could not in fairness close that door by preventing appellant from rebutting and clarifying the patently unfair impression created."). When a party is the first to broach an inadmissible subject during his presentation of evidence, he "opens the door" to evidence on that subject. *See Campbell*, 585 S.W.3d at 585; *Auld*, 34 S.W.3d at 906. When a party opens the door to objectionable

75

evidence, he may not complain of the admission of that evidence when offered by the other side. *Campbell*, 585 S.W.3d at 585.

During the pretrial hearing, the trial court signed the Agreed Order providing that neither party shall refer to or mention the criminal history of either party's family. As explained above, during the trial Roberto presented testimony from Marcia, who testified that Sofia told her "she would kill [R.R.] before she would let the Rincon family have him." The trial court stated that Roberto's counsel should have known that Marcia's "incredibly inflammatory[]" statement could "open the door." The trial court explained it was a problem when one side exploits the exclusion of evidence in the Agreed Order to create a false impression with the jury, found that both sides had exploited the exclusion of evidence, that the use of Marcia's statement could be partly explained by Sofia using the excluded criminal history of Roberto's family, that it was unfair to prevent Sofia from defending her statement by discussing the Rincon family's criminal history, and that Roberto should also be allowed to explain why he had not traveled to Europe to see R.R. The trial court cautioned both parties to limit their testimony to clearing up any false impressions with the jury.

Sofia's counsel then questioned witnesses about the Rincon family's criminal history and secured the following testimony: Dr. Andrei testified that she either did not recall Roberto telling her about his parents' criminal history or he did not tell

her; Marcia testified that Sofia had told her about Roberto being scared for his personal safety because of his father's criminal history; Ricardo explained he was arrested once, his brother was charged in Spain, he was concerned about his father's arrest for bribery charges related to PDVSA but denied the police raided his father's home; and Alexandra testified that her parents previously had armed security guards outside their home to protect the family. During Alexandra's testimony, the trial court told Sofia's counsel that "as far as the opening-the-door situation as to the Rincon criminal stuff that might have made her feel the way she did to make a statement, y'all are going way beyond that[,]" and you need to "use it the way that the Court has told y'all you can use it and the way that it opened the door."

During Roberto's cross-examination, he testified that he told Sofia there had been an attempt on his father's life in Venezuela, he had anxiety about his father going to jail, his father was cooperating with the United States government against other defendants, and he denied his family was at risk for harm but admitted he had testified that he feared the Venezuelan government would harm his father. After being recalled to the stand to clear up any false impression that Marcia's testimony had on the jury, Sofia explained that Roberto has been fearful for much of his life and that Roberto's home was raided by the FBI and his father went to jail, pleaded guilty, and was cooperating with the government. Sofia testified that Roberto's mother and older brother were also arrested in Spain. Sofia stated that Roberto told

her people might seek revenge against his father for "snitching" and that she was scared for herself, R.R., and the entire family. Sofia testified that she told Roberto his family is poison because she "wanted a clean slate" for Roberto, herself, and R.R.

We cannot say the trial court abused its discretion by lifting the previously agreed upon restrictions in the Agreed Order and allowing Sofia to present rebuttal testimony to explain the context of Marcia's testimony to prevent any false impression with the jury. *See In re J.P.B.*, 180 S.W.3d at 575; *Auld*, 34 S.W.3d at 906; *Campbell*, 585 S.W.3d at 585. Roberto's injection of the inflammatory statement could have conveyed the false impression that Sofia was a danger to R.R., and she needed to explain her statement by referencing Roberto's family's criminal history. *See Auld*, 34 S.W.3d at 906; *Haynes*, 808 S.W.2d at 732. The trial court could have reasonably concluded that Roberto opened the door to the evidence about his family's criminal history, and that he may not complain of Sofia's introduction of that evidence to rebut and clarify the patently unfair impression he created. *See Auld*, 34 S.W.3d at 906; *Campbell*, 585 S.W.3d at 585; *Haynes*, 808 S.W.2d at 732.

Additionally, the trial court could have reasonably concluded that the evidence of his family's criminal history was relevant to R.R.'s best interest because it concerned Roberto's family home environment and any risk of harm to R.R. *See* Tex. R. Evid. 401. The emotional and physical danger to R.R. and the stability of Roberto's home environment are factors the trial court needed to consider in

78

determining R.R.'s best interest, which is a primary consideration in determining matters of conservatorship, possession, and access. *See* Tex. Fam. Code Ann. § 153.002; *In re J.J.R.S.*, 627 S.W.3d at 218; *Holley*, 544 S.W.2d at 371–72; *see also* Tex. Fam. Code Ann. § 153.001(a)(2) (explaining the public policy of this state is to provide a safe, stable, and nonviolent environment for the child). Having determined the evidence about Roberto's family's criminal history was relevant to R.R.'s best interest and that Roberto opened the door to Sofia's need to introduce that evidence for rebuttal and clarification, the trial court could have reasonably concluded the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403; *In re A.D.*, 474 S.W.3d at 727–28; *Murray*, 294 S.W.3d at 368. We conclude the trial court did not abuse its discretion by admitting the complained-of testimony. *See In re J.P.B.*, 180 S.W.3d at 575. We overrule issue three.

## SOFIA'S CROSS-APPEAL

Sofia complains the trial court abused its discretion by failing to extend comity to the Russian Final Order. During oral argument, Sofia's attorney officially withdrew this issue raised in her cross-appeal. Subsequently, Sofia's counsel confirmed in writing to this Court that the issue raised in her cross-appeal had been withdrawn. Thus, we need not consider it.

**CONCLUSION**

Having overruled Roberto's issues on appeal, we affirm the trial court's

Revised Final Decree of Divorce incorporating its Reformed Interlocutory Order.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on January 9, 2025
Opinion Delivered February 27, 2025

Before Golemon, C.J., Johnson and Wright, JJ.